IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | 8:09CR48 |
| Plaintiff, ) | |
| ) | REPORT AND |
| vs. ) | |
| ) | RECOMMENDATION |
| LUIS NANDI-CIPRIANO, ) | |
| ) | |
| Defendant. ) | |

This matter is before the court on a motion to suppress (Filing No. 76) filed by Luis Nandi-Cipriano (Nandi-Cipriano). Nandi-Cipriano is charged in an Indictment along with three other co-defendants with a conspiracy to distribute and possess with intent to distribute cocaine (Count I) in violation of 21 U.S.C. § 846. Nandi-Cipriano is also charged in Count IV of the Indictment with the possession with intent to distribute 50 grams or more of cocaine on January 22, 2009, in violation of 21 U.S.C. § 841(a)(1). Nandi-Cipriano seeks to suppress all evidence derived from a warrantless search of his residence by law enforcement officers on January 22, 2009, arguing he did not provide the officers with consent. Nandi-Cipriano filed a brief (Filing No. 78) in support of the motion to suppress. The government filed a brief (Filing No. 93) in opposition to the motion to suppress.

The court held an evidentiary hearing on June 16, 2009. Nandi-Cipriano was present for the hearing with his counsel, Beau G. Finley. Assistant U.S. Attorney Maria R. Moran represented the United States. Laura Garcia-Hein, a certified interpreter in the Spanish language, served as interpreter during the evidentiary hearing. The court heard testimony from the following witnesses: Cass County Sheriff Investigator and Drug Enforcement Administration (DEA) Task Force Officer (TFO) Matthew Watson (Investigator Watson), Eugene Wells (Mr. Wells), and Nandi-Cipriano. The court received into evidence Nandi-Cipriano's employment records (Exhibit 1). A transcript (TR.) of the hearing was filed on June 24, 2009. The matter was deemed submitted upon filing of the transcript.

## FINDINGS OF FACT

Investigator Watson has been an investigator with the Cass County Sheriff's Office since 2001 and has been attached to the DEA as a TFO since 2006 (TR. 4). On January 16, 2009, Investigator Watson became involved in an investigation of Roy Lenos Paz, also known as "Gordo," and conducted surveillance of a controlled cocaine purchase in Lincoln, Nebraska (TR. 4-5). After the controlled purchase occurred, Investigator Watson followed a minivan involved in the controlled purchase to 2960 Pacific Street in Omaha, Nebraska (TR. 5). Investigator Watson witnessed four people exit the minivan and enter the residence (TR. 5).

On January 22, 2009, Investigator Watson was involved in another controlled cocaine purchase, which was arranged to occur in Lincoln, Nebraska, wherein the 2960 Pacific Street residence was considered a source for the cocaine (TR. 6). Investigator Watson began surveillance at the residence at 10:30 a.m., the same day (TR. 7, 25). At approximately 12:15 p.m., a Jeep arrived at the residence and an individual, later identified as Nandi-Cipriano, exited the Jeep and entered the residence (TR. 7). Investigator Watson recognized the license plate as registered to one of the people suspected of being involved with delivering narcotics (TR. 7). Investigator Watson watched as Nandi-Cipriano walked from the building to the Jeep several times over the course of half an hour, sometimes carrying items (TR. 8). Nandi-Cipriano's actions made Investigator Watson more alert as Nandi-Cipriano's trips back and forth from the Jeep to the apartment building occurred during the time of a controlled narcotics purchase (TR. 8).

At approximately 12:45 p.m., Investigator Watson, DEA Special Agent James Wahl (Agent Wahl), and two Federal Bureau of Investigation (FBI) agents approached Nandi-Cipriano (TR. 9). Investigator Watson parked his vehicle in front of the residence and walked up to Nandi-Cipriano (TR. 9). Agent Wahl and the two FBI agents also exited their vehicles to provide backup to Investigator Watson, but Agent Wahl and the FBI agents did not make contact with Nandi-Cipriano (TR. 10). Investigator Watson was positioned about two feet in front of Nandi-Cipriano (TR. 32). Agent Wahl was positioned approximately eight to ten feet in front of Nandi-Cipriano, which would place Agent Wahl six to eight feet behind Investigator Watson (TR. 10-12, 28, 30-33). The two FBI agents were positioned

about fifteen feet from Nandi-Cipriano and were in Nandi-Cipriano's peripheral vision over his right shoulder (TR. 10-12, 28-33). According to Investigator Watson, Nandi-Cipriano was not surrounded by the officers, nor did the officers intend to surround Nandi-Cipriano (TR. 11-12). Investigator Watson, Agent Wahl, and the FBI agents were dressed in plain clothes with the exception of a hat, a badge, and a bulletproof vest which had "POLICE" printed on the front and back of the vest (TR. 10, 26). Investigator Watson was armed, however, his firearm was not visible (TR. 11). The FBI agents also carried handguns, which may have been concealed or exposed (TR. 11). Agent Wahl had a shotgun, which he was holding parallel to his leg, pointed toward the ground (TR. 11, 33-34, 51). Neither Investigator Watson, Agent Wahl, nor the FBI agents drew their weapons on Nandi-Cipriano (TR. 11, 13).

     Nandi-Cipriano was outside of the residence standing next to the Jeep when Investigator Watson approached (TR. 9). As Investigator Watson approached, he identified himself as a police officer (TF. 9). Neither Investigator Watson nor Agent Wahl speak Spanish (TR. 12, 13). Investigator Watson does not know whether the FBI agents speak Spanish, however, Investigator Watson did not hear the FBI agents speak Spanish on January 22, 2009 (TR. 12). Investigator Watson testified Nandi-Cipriano looked surprised that an officer approached him (Nandi-Cipriano) (TR. 9-10). Investigator Watson asked Nandi-Cipriano whether he understood Investigator Watson was a police officer (TR. 9-10). Nandi-Cipriano responded "yes" (TR. 9-10). Investigator Watson then asked Nandi-Cipriano whether Nandi-Cipriano understood English (TR. 10, 12). Nandi-Cipriano responded "yes" (TR. 10, 36-37).

     After confirming Nandi-Cipriano spoke English, Investigator Watson asked Nandi-Cipriano whether the Jeep belonged to Nandi-Cipriano (TR. 12). Nandi-Cipriano told Investigator Watson the Jeep belonged to his friend who was out of town and who had given Nandi-Cipriano permission to use the vehicle (TR 12). Investigator Watson asked Nandi-Cipriano where Nandi-Cipriano lived (TR. 12-13). Nandi-Cipriano turned and pointed to the residence and stated "B," which Investigator Watson took to mean apartment B (TR. 12-13). Investigator Watson explained to Nandi-Cipriano the reason the officers were at the residence was because the officers had information that the Jeep was involved

in the transportation of illegal narcotics (TR. 13).  Investigator Watson asked Nandi-Cipriano whether Nandi-Cipriano had any narcotics in his apartment (TR. 13).  Nandi-Cipriano replied "no" (TR. 13).  Investigator Watson then asked if the officers could search Nandi-Cipriano's apartment for narcotics and Nandi-Cipriano replied "yes" (TR. 13, 41).  Investigator Watson did not inform Nandi-Cipriano that Nandi-Cipriano could refuse to provide the officers consent to search his apartment (TR. 14).  When Investigator Watson asked for Nandi-Cipriano's consent to search the apartment for narcotics, Investigator Watson did not promise anything in exchange for Nandi-Cipriano's consent (TR. 15).  Moreover, Nandi-Cipriano did not complain of any mental or physical problems nor did Nandi-Cipriano appear to Investigator Watson to be under the influences of narcotics or alcohol when Nandi-Cipriano provided consent (TR. 14-15).

The entire conversation Investigator Watson had with Nandi-Cipriano was in English and Investigator Watson did not have any trouble communicating with Nandi-Cipriano (TR. 13, 14).  Investigator Watson testified about one minute had elapsed from the time of Investigator Watson's initial encounter with Nandi-Cipriano to the time Investigator Watson asked for consent to search the apartment (TR. 15).  Nandi-Cipriano testified the encounter next to the Jeep took longer than one minute (TR. 77).  Nandi-Cipriano was not arrested, handcuffed, or restrained during his conversation with Investigator Watson at the Jeep (TR. 13).

Once inside the building, the officers were led into a large, eight- to ten-foot wide hallway which leads into different directions and apartments (TR. 15-16).  There was nothing in the large hallway except for trash, dirt, and spider webs (TR. 16).  The officers walked past an area, which presumably led to other apartments, and Nandi-Cipriano led the officers to a specific apartment (TR. 15, 35-36, 39).  Before Nandi-Cipriano opened the door, Agent Wahl stepped to the side of Nandi-Cipriano, told Nandi-Cipriano to hold on, and told Investigator Watson the officers should clear the apartment before entering (TR. 15-16, 39-41).  Nandi-Cipriano had a confused look on his face and Agent Wahl told Nandi-Cipriano the officers wanted to make sure no one else was in the apartment (TR. 16, 39-41).  Nandi-Cipriano responded there was no one in the apartment (TR. 16).  Investigator Watson explained to Nandi-Cipriano the need to ensure the apartment was

clear as sometimes people hide in apartments and asked if the officers could go in quickly and clear the apartment (TR. 16). Nandi-Cipriano "yeah, no problem." (TR. 16, 41). One officer remained outside the apartment with Nandi-Cipriano while the other three officers went into the apartment (TR. 17). After clearing the apartment, the officers exited the apartment (TR. 17). The clearing process took approximately one minute and no drugs were found during the process (TR. 43).

The officers immediately reentered the apartment with Nandi-Cipriano (TR. 18). Investigator Watson and Nandi-Cipriano sat down at the kitchen table while the other three officers searched the apartment for narcotics (TR. 18). Investigator Watson noticed, when he entered the apartment, a shrine for the reputed patron saint of narcotics trafficking (TR. 18). Also, Investigator Watson noticed a corner of left-over baggie containing white powder residue on the kitchen table (TR. 18-19). Investigator Watson testified the officers searching the apartment were visible to Nandi-Cipriano for most of the time due to the layout of the apartment, and if the officers were out of sight of Nandi-Cipriano, Nandi-Cipriano knew where the officers were in the apartment (TR. 19). Nandi-Cipriano also knew the officers were searching the apartment for narcotics (TR. 19). Investigator Watson asked Nandi-Cipriano some general background questions while sitting at the kitchen table (TR. 18). Investigator Watson also joked with Nandi-Cipriano about the pictures on the walls (TR. 18).

Within a few seconds after Investigator Watson sat down at the table with Nandi-Cipriano, the other officers reported that they had found narcotics (TR. 19, 43-45). Investigator Watson asked Nandi-Cipriano about the narcotics and why Nandi-Cipriano said to Investigator Watson there were no narcotics in the apartment (TR. 19, 43). Nandi-Cipriano responded that the narcotics were not his (TR. 19). During the search Nandi-Cipriano never asked the officers to stop searching the apartment (TR. 20).

After the officers found the narcotics, Investigator Watson read Nandi-Cipriano his *Miranda* rights (TR. 20). Investigator Watson read the *Miranda* rights off a card, verbatim (TR. 20). Investigator Watson specifically asked Nandi-Cipriano whether he understood the *Miranda* rights and Nandi-Cipriano responded "yes" (TR. 20-21). After the *Miranda* rights were administered, Investigator Watson did not handcuff Nandi-Cipriano, but

continued to ask Nandi-Cipriano questions (TR. 21). Investigator Watson asked Nandi-Cipriano whether he used drugs (TR. 21). Nandi-Cipriano admitted right away to using marijuana and cocaine (TR. 21-22). Investigator Watson asked Nandi-Cipriano about the narcotics in the apartment and whether Nandi-Cipriano knew what his roommates were doing with the narcotics (TR 22). However, Nandi-Cipriano maintained that he did not know that there were narcotics in the apartment although he did remember his roommates talking about narcotics (TR. 22). Investigator Watson and Nandi-Cipriano talked for about twenty minutes (TR. 21). Investigator Watson testified the reading of the *Miranda* rights and all conversation was in English (TR 21).

During Investigator Watson's conversation with Nandi-Cipriano and the search of the apartment, other officers arrived to assist with the search and seizure of contraband due to the significant amount of narcotics discovered (TR. 22). More than two hours after the officers entered the apartment, two more Spanish-speaking individuals arrived at the apartment (TR. 22-24). Investigator Watson asked whether the two individuals spoke English but neither of them could (TR. 23). The two men were separated and questioned about their reasons for being at the apartment (TR. 23). A Spanish-speaking officer, TFO West, had arrived and was able to speak with one of the individuals (TR. 23). The other individual was with Agent Wahl and Nandi-Cipriano (TR. 23). While Investigator Watson and TFO West interviewed one individual, Nandi-Cipriano translated for Agent Wahl so he could and speak with the other individual (TR. 23-24, 39). Investigator Watson testified the officers were in the apartment for more than two hours (TR. 24).

Nandi-Cipriano had a different version of the encounter with Investigator Watson and the other officers (TR. 77-82). According to Nandi-Cipriano, Investigator Watson's questions concerned the Jeep, to which Nandi-Cipriano gave Investigator Watson the key, rather than the apartment (TR. 78). However, Investigator Watson did not search the Jeep until after the apartment was searched (TR. 78). Nandi-Cipriano was under the impression the officers wanted to search the Jeep and only led the officers to his apartment to prove to the officers the apartment was indeed where Nandi-Cipriano lived (TR. 78-79). Nandi-Cipriano opened the door to the apartment, not for the officers to search the apartment, but to show the officers the apartment was Nandi-Cipriano's (TR. 79). Nandi-Cipriano

6

testified he was surprised when the officers entered his apartment and he did not object to the officers entering his apartment because he did not know he could refuse their entry (TR. 79). Moreover, Nandi-Cipriano claims if Investigator Watson had advised Nandi-Cipriano that he could refuse consent then Nandi-Cipriano would have stopped the officers from searching his apartment (TR. 80).

Nandi-Cipriano testified that he does not speak English and has a very limited knowledge of the English language (TR. 83). Nandi-Cipriano was born in Mexico in 1974 and is currently 35 years old (TR. 69). He was raised in Mexico and moved to the United States in 1998 (TR. 69). Nandi-Cipriano attended school in Mexico and has completed education through the ninth grade (TR. 70). Nandi-Cipriano testified he speaks very little English and can understand only a limited amount of English (TR. 70-71). Moreover, Nandi-Cipriano testified he had never been searched by police officers nor had he ever given statements to police officers (TR. 71). The only time Nandi-Cipriano has seen a search of a person's residence was when he lived in Mexico (TR. 70-71). Currently Nandi-Cipriano is unemployed, however he did work at Needhams, Incorporated (Needhams) from January 2001 to May 2008 (TR. 55-56, 72-73).

Mr. Wells has worked with Needhams for approximately 25 years (TR. 52-54). Mr. Wells speaks very limited Spanish (TR. 56). Mr. Wells is a production supervisor for Needhams and was Nandi-Cipriano's supervisor when Nandi-Cipriano worked as Mr. Wells's lead man (TR. 52-54). As a lead man, Nandi-Cipriano had more responsibilities than other employees and would direct workers under Mr. Wells's supervision as well as translate for Mr. Wells (TR. 54, 56-57). According to Mr. Wells, one of the requirements for a lead man is that the person be bilingual (TR. 58).

Mr. Wells testified that, during the course of Nandi-Cipriano's employment with Needham's, Nandi-Cipriano would periodically take tests which would allow him to operate machinery (TR. 60-61, Ex. 1). Nandi-Cipriano completed these tests in English and Nandi-Cipriano translated tests for new, Spanish-speaking employees (TR. 59-61). Moreover, Nandi-Cipriano applied for raises during his employment which listed Nandi-Cipriano as a lead man and a translator (TR. 62, Ex. 1).

Mr. Wells has known Nandi-Cipriano for approximately ten years (TR. 56). Mr. Wells has never had difficulty speaking English with Nandi-Cipriano (TR. 56-58). Mr. Wells would speak with Nandi-Cipriano about current events, family, and sports (TR. 64). Nandi-Cipriano's wife, who also worked for Mr. Wells, speaks English as her primary language (TR. 58). According to Nandi-Cipriano, Mr. Wells was mistaken when Mr. Wells testified Nandi-Cipriano could speak English and was a translator (TR. 83). When Nandi-Cipriano worked at Needhams, although his requests for a pay raise listed "translator" as one of the jobs Nandi-Cipriano performed, he did not actually translate, but memorized English words which had been repeated to him many times and related the information to Spanish-speaking employees (TR. 83-84).

## LEGAL ANALYSIS

Nandi-Cipriano argues that he did not grant the officers consent to search his apartment. The only consent Nandi-Cipriano provided the officers was consent to search the Jeep. Nandi-Cipriano claims when he led the officers to the apartment building he was under the impression the officers wanted to see the common area in the building and where Nandi-Cipriano lived. Nandi-Cipriano did not believe the officers wanted to search his apartment. In the alternative, Nandi-Cipriano argues if consent was obtained the consent was not voluntary, he was coerced, and the officers exceeded the scope of Nandi-Cipriano's consent. Moreover, Nandi-Cipriano claims he does not speak English and could not understand the officers.

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. A warrantless search is "per se unreasonable . . . subject only to a few specifically established and well delineated exceptions." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). "One such exception is that a warrantless search is permissible if the authorities have obtained the voluntary consent of a person authorized to grant such consent." *Schneckloth*, 412 U.S. at 219. "Voluntariness is determined by 'the totality of the circumstances' taking into consideration both the 'conduct of the officers and the characteristics of the accused.'" *United States v. Shan Wei Yu*, 484 F.3d 979, 985 (8th Cir. 2007) (**quoting** *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960); *Wilson v.*

8

*Lawrence County*, 260 F.3d 946, 952 (8th Cir. 2001)).  The government bears the burden of proving voluntary consent to search by a preponderance of evidence.  *United States v. Esquivel*, 507 F.3d 1154, 1159-60 (8th Cir. 2007).  "The precise question is not whether [the defendant] consented subjectively, but whether his conduct would have caused a reasonable person to believe that he consented." *United States v. Williams*, 521 F.3d 902, 906 -907 (8th Cir. 2008) (**qouting** *United States v. Jones*, 254 F.3d 692, 695 (8th Cir. 2001)).  "Consent can be inferred from words, gestures, and other conduct." *Jones*, 254 F.3d at 695 (8th Cir. 2001).  "[If a defendant is] not advised of his right to refuse consent, that is not in and of itself sufficient to find that consent was not voluntarily given."  *United States v. Alcantar*, 271 F.3d 731, 737 (8th Cir. 2001) (**citing** *United States v. Zapata*, 180 F.3d 1237, 1242 (8th Cir. 1999)).  "*Miranda* warnings [ ] are not required for consent to a search to be voluntary, although they can lessen the probability that a defendant was subtly coerced." *United States. v. Lee*, 356 F.3d 831, 834 (8th Cir. 2003).

When determining whether a person provided consent voluntarily the court reviews various personal characteristics and environmental circumstances.  *United States v. Barnum*, 564 F.3d 964, 969 (8th Cir. 2009); *United States v. Comstock*, 531 F.3d 667, 676-677 (8th Cir. 2008).  Some personal characteristics that aid in determining voluntariness of consent are age, intelligence, education, whether an individual was under the influence of drugs or alcohol, whether an individual was read his *Miranda* rights, and whether an individual had experienced prior arrests. **See** *United States v. Comstock*, 531 F.3d 667, 676-77 (8th Cir. 2008) (listing factors).  A court may also look at environmental factors including, the period of time that the individual was detained; whether the police threatened, physically intimidated, or punished the individual; whether promises or misrepresentations were made upon which the individual relied; whether the individual was in custody or under arrest at the time of consent; whether the consent occurred in a public or secluded place; and whether the individual objected or stood by silently while the search occurred.  *Id.* (**citing** *United States v. Saenz*, 474 F.3d 1132, 1137 (8th Cir. 2007)); **see also** *Barnum*, 564 F.3d at 969.  "A consensual search may not legally exceed the scope

9

of the consent supporting it." *Chaidez*, 906 F.2d at 381 (**citing** *Walter v. United States*, 447 U.S. 649, 656-57 (1980)).

The court determines that Investigator Watson's and Mr. Wells's testimonies are most credible and are supported by the evidence in this case. This determination is made based upon each of the witnesses' demeanor during the hearing, intelligence, memory, motives, general reasonableness, and consistency with other testimony. The evidence more closely corroborates Investigator Watson's testimony concerning Nandi-Cipriano's consent to search the apartment. Also, the evidence supports Investigator Watson's and Mr. Wells's testimonies concerning Nandi-Cipriano's ability to understand and speak English. First, Nandi-Cipriano worked as an interpreter for Needhams, as indicated on his request for a pay raise on March 20, 2007 (Exhibit 1 p. 36 - Nandi-Cipriano's employment records). Second, Mr. Wells, who was subpoenaed to testify, spoke regularly with Nandi-Cipriano in English. Third, during Nandi-Cipriano's testimony, he was able to relate in court several of the questions Investigator Watson asked Nandi-Cipriano. Nandi-Cipriano was able to testify in court that Investigator Watson asked about the Jeep, who owned the Jeep, and where Nandi-Cipriano lived (TR. 12-13, 84-85). For Nandi-Cipriano to repeat the questions Investigator Watson asked, Nandi-Cipriano had to have known English well enough to understand Investigator Watson. Moreover, Nandi-Cipriano joked with the officers about the pictures on the walls (TR. 81-82), admitted to using narcotics when asked by Investigator Watson (TR. 21-22), and replied appropriately to Investigator Watson's questions (TR. 20-21). Fourth, Investigator Watson testified that Nandi-Cipriano responded affirmatively when asked whether Nandi-Cipriano spoke English and Investigator Watson did not have any difficulty communicating, in English, with Nandi-Cipriano. Finally, on several occasions, which were obvious to the court, Nandi-Cipriano answered questions before the court's Spanish interpreter translated the questions into Spanish (**see, e.g.,** audio recording of TR. 75). The court finds Nandi-Cipriano's claim that he did not speak or understand English to be wholly without merit.

The government has the burden of proof to show that the officers legally entered Nandi-Cipriano's apartment and his consent was freely and voluntarily given. After confirming Nandi-Cipriano spoke English, Investigator Watson expressed to Nandi-

Cipriano that the officers were searching for narcotics and the officers would like to search Nandi-Cipriano's apartment for narcotics. Investigator Watson asked if Nandi-Cipriano would consent to search of Nandi-Cirpiano's apartment. Nandi-Cipriano said "yes" to the search of his apartment and indicated through his actions to the officers that the officers could search his apartment for narcotics when Nandi-Cipriano turned around and led the officers to his apartment. **See** *United States v. Williams*, 346 F.3d 796, 799 (8th Cir. 2003) (consent to entry found where individual opened door wide and stepped aside).

      A reasonable person in Investigator Watson's position would conclude that Nandi-Cipriano provided valid consent. **See** *Id.* (consent reasonably implied from behavior) Nandi-Cipriano was obviously not a minor and according to Investigator Watson, Nandi-Cipriano did not exhibit any mental or physical infirmities nor was Nandi-Cipriano under the influence of narcotics or alcohol. Also, during the initial encounter with Nandi-Cipriano at the Jeep, the officers were not surrounding Nandi-Cipriano or pressuring him into providing consent to the officers to search his apartment and the consent was not given under coercion. Although one of the officers was carrying a shotgun, the shotgun was pointed toward the ground and not held in a threatening manner. Nandi-Cipriano had plenty of space to maneuver and his movement was not restrained. Moreover, Nandi-Cipriano had every opportunity to revoke his consent at any point before or during the search of his apartment.

      Although Nandi-Cipriano was not advised of his right to deny or revoke consent, nor was Nandi-Cipriano administered his *Miranda* rights before the officers began a search of his apartment, this does not invalidate the consent Nandi-Cipriano granted the officers. Analyzing the totality of the circumstances, Investigator Watson and the other officers had a reasonable belief that Nandi-Cirpiano voluntarily consented to a search of his apartment. Immediately after Investigator Watson asked Nandi-Cipriano whether the officers could search Nandi-Cipriano's apartment, Nandi-Cipriano turned around and led the officers to the apartment and then opened the door to his apartment. If Nandi-Cipriano had not wanted the officers to enter his apartment or was surprised by the entry, Nandi-Cipriano had the opportunity to revoke consent when the officers started to enter his apartment.

11

Moreover, Nandi-Cipriano could have objected to the officers entering his apartment when the officers asked whether they could clear the apartment.

Concerning Nandi-Cipriano's alternative argument that the officers exceeded the scope of Nandi-Cipriano's consent, the consent Nandi-Cipriano provided to the officers was to search his apartment for narcotics. A search for narcotics is exactly what the officers did, which was within the scope of Nandi-Cipriano's consent. Nandi-Cipriano maintains the scope of the search was for the common area of the apartment building and not Nandi-Cipriano's specific apartment. However, Nandi-Cipriano's actions contradict his argument as Nandi-Cipriano provided the officers consent to search the apartment, led the officers to his apartment, and opened the door to his apartment. The officers did not exceed the scope of Nandi-Cipriano's consent.

**IT IS RECOMMENDED TO SENIOR JUDGE LYLE E. STROM that:**

Luis Nandi-Cipriano's Motion to Suppress (Filing No. 76) be denied.

**ADMONITION**

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) business days after being served with a copy of this Report and Recommendation. Failure to timely object may constitute a waiver of any objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 21st day of July, 2009.

BY THE COURT:

 s/Thomas D. Thalken
United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.